**Exhibit A**

### HEARING TRANSCRIPT[1]

HE- Phyllis Baker
CS- Charles Stanton (client)
SB- Siobhan Briley (Georgetown Student)
DR- Deborah Ritter (supervising attorney)
CSO- Nacre Williams
BB- Brett Bartholomew (Officer)


HE- My name is Phyllis Baker I am a hearing examiner with the U.S. Parole Commission. Can you state your name and register number for the record.

CS- Charles Stanton 280 908

HE- and do you know your federal number?

CS- 04825007
HE- and counsel your name and business address?
SB- Siobhan Briley, Georgetown Criminal Justice Clinic, 111 F Street N.W. I am supervised by the D.C. Public Defender Service at 633 Indiana Avenue NW.

HE- and I ask you to put your name on the record supervisor.

DR- Deborah Ritter, staff attorney supervising Ms. Briley.

HE- Spell your first name make sure I have it correct.

SB- S-I-O-B-H-A-N

HE- Ok, thank you, Mr. Stanton this is a revocation hearing to determine whether you have violated the conditions of your supervised release, I will review and make finding of fact of fact as to each of the charges against you, If I find that you have violated one or more of the conditions of your release I will make a recommendation as to whether or not your supervised release should be revoked. If I recommend revocation of your supervised release I will also make a recommendation as to whether you should receive a new term of imprisonment and the length of that term, in addition I will make a recommendation as to whether an additional period of supervision shall follow your release

---

[1] The Commission provided Mr. Stanton with an audiotape of the March 6, 2006, revocation hearing and the transcript of the tape was prepared by the Public Defender Service. Should the court want to review the actual audiotape, we would be happy to provide a copy.

from custody, the length of that additional term of supervision and any special conditions of release. This is an administrative hearing the rules limiting the type of evidence admissible in a criminal trial do not apply in a supervised release revocation hearing. Disputed charges will be resolved by the preponderance of the evidence, the preponderance of the evidence means evidence that taken as a whole is more credible and convincing then the evidence offered in opposition to it. You may confer with the attorney at any time during the hearing, if at any time during the hearing you have a question about the procedure, feel free to ask me about it. At this hearing you have certain rights which I will now review with you. Did you or your attorney received written notice of this hearing?

CS: Yes

HE: Did you or your attorney received a packet of information that includes the letter of probable cause, a copy of the warrant application and the information supporting the charges against you?

CS: Yes

HE: Have you had sufficient time to confer with your attorney?

CS: Yes

HE: Counsel, have you had sufficient time to meet with your client.

SB: Yes ma'am

HE: Are you ready to go forward

SB: Yes

HE: You have the right to call voluntary witnesses, do you have any witnesses?

SB: No

HE: You have the right to submit documentary evidence, if you have any documentary evidence may give it to me when we discuss the charge to which it applies.

You have the right to cross-examine adverse witnesses who testify, today we have community supervision officer Ms. Williams- what's the first name again?

CSO- Nacre

HE: And uh adverse officer, adverse witness, officer Bartholomew, I also see that you requested the presence of Officer Harry Sowers and I have no information as to why he is not here today. Is there anybody else that you asked for today that I have not identified

SB: No

HE: ok (Silence) I am just noting that Sowers was requested and I don't know why he is not here. I will review each charge and inform you of the information underlying the charge I will then ask you to admit or deny each charge and will give you an opportunity to respond to the charge. If you choose to make no reply to the charge the hearing will proceed and my recommendation will be made on the basis of the information available. At the conclusion of the hearing I will inform you of my recommendations, these will then be forwarded to the central office where they will be reviewed. A parole commissioner will make the final decision, the notice of action containing the decision will be issued within 21 days of this hearing. I will give you this informational sheet, this is for you to keep and read later it describes the processing of the case after the hearing and your right to an administrative appeal if you believe the decision the commission makes is inappropriate. Do you have any procedural matters that you wish to raise before we proceed?

SB: No

HE: Mr. Stanton and Ms. Williams I ask you to raise your right hand. Do you solemnly swear or affirm under penalty of perjury that the testimony you are about to give in the case now in hearing will be the truth the whole truth and nothing but the truth.

CSO: Yes

CS: Yes

HE: And Ms. Williams identify your work location.

3

CSO: 3850 South Capitol Street S.W. Washington D.C. 20032

HE: Ok thank you. Mr. Stanton you have seen the warrant application and the charges against you.

CS: Yes

HE: There is an administrative charge and a new law violation charge. The administrative charge is use of dangerous and habit forming drugs. Showing you tested positive for PCP on a few dates between September 26, 2005 and November 7, 2005. Do you admit of deny this charge?

SB: Admit, but it's been sanctioned.

HE: You want to explain the sanction.

SB: The uh, information I have umm from the parole officer, CSO's report says that "the officer sanctioned Mr. Stanton accordingly for each violation listed, Mr. Stanton adhered to all sanctions imposed and since positive results of last urinalysis submission was returned negative for illegal substances."

HE: Ms. Williams did umm you proceed with intervening sanctions, as council has indicated?

CSO: Yes, Ma'am

HE: And his response to it was what?

CSO: He adhered to all sanctions.

HE: Ok. Did the Commission be, get advised and impose a sanction as well?

CSO: No.

HE: Any positive tests after the last sanction?  And when was the last sanction?

CSO: Last sanction was… last sanction was for the last positive on 11/7/ 2005.  And then he incurred the re-arrest which was subsequently dismissed or it was no papered.

SB: It   does note…

4

HE: So, the last sanction was based on the...

CSO: on 11/7/05, positive

SB: It does note that the last urinalysis submission, well there's the next urinalysis submission on 11/11, four days later, was negative.

HE: The arrest was on 11/10/05, so the 11/11/05 was that taken by your officer?  Was that a uhh urine submitted as a result of the arrest?

CSO: Lock up, Lock up

HE: Ok.  And any more urines after that?

CSO: No.

HE: And the warrant was executed on January 3rd '06.  So what went on in December?

CSO: December? December 05?

HE: Mhmm

CSO: Umm and I'm not being facetious, I brought you to 11/7/05

HE: Yes

CSO: So, I mean. Ok as far as him testing positive and being sanctioned...

HE: Right.

CSO: Ok, he began testing positive, he was compliant up until 9/26 with the positive for PCP, again 10/3, again 10/24, again 10/31.  Each time he was sanctioned verbally, writtenly umm reprimanded, 5 day reporting.  And then like I said he was sanctioned for, he was, I did the CIT appointment, umm we were going to be having an assessment done to put him in treatment – out-patient treatment–and then the arrest occurred.  He was diligently working, looking for a job.

5

HE: Ok, ok let me ask you this.  I do see November 14th '05 that was negative.  Were there any urines taken in December that I don't have?

CSO: No. I have, uhhh, well December 3, December 24, December 31.

HE: December 3, 24th and…

CSO: 24th, December 24th. Yes, Ma'am.

HE: Yes, not 23.

CSO: Uhh December 3rd, December 24th.

HE: Ok

CSO:  And December 31st

HE: Alright.  All were negative?

CSO: Yes, no positive.

HE: All were positive?

HE: All were positive for PCP.

SB: I'm sorry, ummm, are you reading from the…

HE: My violation report.

SB: This one she is referring to the dates in October that are on the violation report.  I don't…

HE: I want to know what happened

SB: Do we have anything on…

HE: I want to know what happened between November 11, 05 and January 3rd 06.  Cuz I don't have anything on December. I'm looking at what happened in December.

CSO: In November.  You are looking for November you said.

HE: I'm looking for December.

SB:  December, because we don't have a record on what she would like to know.

HE: Was he in the community in December…

CSO: Yes, ma'am

HE: Or has he been…

CSO: He was at…

DR: Did he test negative?

SB: Did he come, did he… did he during

CSO: Positive, for the month of December

HE: My God, you know what?  I apologize, I'm looking at October.  Oh. I apologize.

HE: Lets go back.  The warrant application takes us, to November 7th '05 with positive urines.

CSO: Exactly.

HE: Council had made reference to November 11th, '05.  That was negative.

CSO: Ok, I'm sorry, I apologize

HE: Tell me about December.

CSO: Exactly. He was locked up.

HE: In December?

CSO:  He was locked up.  Uh I requested the hold because of the ummm… and then the warrant was, when was the warrant expedited?  Because it was done…

HE: January 11, 06

CSO: Yeah he was locked up.  He wasn't released.

HE: Alright, so you're telling me he was not…

CSO: After the lock up?

SB: He was released after he was no papered on it, Im sure they released him. That wasn't…

CSO: No problem, No problem. They were all negative. All negative.

HE: Ok tell me, when was he released from his November 10th?

CSO: The next day, the next day.

HE: Hold on, just one person.

CSO: The next, the very next day. And he denied incur any more positives, since the last…

HE: Do you show that he tested in December, cuz I don't have that.

CSO: I, I, I know I've been reviewing it, I don't have it with me. Well I may have it, but I know I was… I did the GM pre-report. No the last one I have is 11/14 which indicated negative. 11/11 was his lock up which indicated negative. So I have been reviewing it, but ummm he wasn't submitting to any more positives. He wasn't submitting to any more…

HE: My question is: did he test in December at all.

CSO: Yes, he continued testing.

HE: But you have no record of that.

CSO: I don't have it with me. I don't have it with me.

DR: But to the best of your recollection, he was testing negative?

CSO: He was testing negative, yes.

HE: Ok. I'm just trying to be up to date.

CSO: Right.

HE: What I'm hearing is that with some intervening sanctions and since then there has been no indication of drug use.

CSO: Exactly.

HE: Alright.  He was on a testing schedule.

CSO: He sure was.  I have increased his testing schedule because he was all the way down to schedule on once a month and then we went to once a week.

CS: once a week.

CSO: Yeah, I increased it to umm schedule two.

HE: And that was increased when?

CSO:  Ummm…. That was one of his sanctions, that was one of his sanctions I put on probably the 3rd positive, which was probably December the 24th.

HE: No.  Not December the 24th.

CSO:  Because, I'm sorry, October.  Why do I keep looking at this date?

HE: I don't know.

CSO: Yeah, yeah it was increased.

SB: It looks like it.  Because they….

CSO:Its week after week, exactly.

HE: Anything further on charge one?

SB: No.

HE: Ok charge number two. The law violation.  The rest of November 10, 2005, where police observed a hand to hand transaction, between you and another person.  You walked to the rear of a parked car, sat down on the half wall, and seen handing a small object to the other individual in exchange for currency.  You were stopped and police recovered a ziplock bag containing 14 smaller ziplocks of crack cocaine from the ground behind the parked car.  You were arrested the same day and have also indicated you were released the next day and the case was no papered.  Do you admit or deny this charge?

9

SB: Deny.

HE: Anything you want to say about this?

CS: When they came…

DR: We would like to wait until the testimony of the officer.

SB: Yeah, we would like to wait till the testimony of the police officer.

HE: Alright.

--- break in tape---

HE: Phyllis Baker, I am the hearing examiner.  We have attorneys Briley and assisting her, Attorney Ritter. Testimony of today's hearing is taken under oath, I ask you to please raise your right hand.  Do you solemnly swear or affirm under penalty of perjury that the testimony you are about to give in the case now in the hearing will be the truth, the whole truth and nothing but the truth?

BB: I do.

HE: Thank you.  State your name and what location.

BB: first name is "Brett" last name is "Bartholomew". Metropolitan Police Department 1st District.  FMT

HE: FMT

BB: Yeah, focus mission team same thing as… inaudible

HE: Ok.  I want to take you to the date of November 10, 2005.  Do you recognize the person sitting here?

BB: Yes.

HE: Do you know him by name?

BB:  [inaudible]

HE: Ok.  You recognize the face, though.

BB: Yes.

HE: Ok.  He is Charles Stanton.  On the date of November 10, 2005, I have a police report showing that he was arrested.  Can you tell me what happened on that date as to why you came to arrest him?

BB: Ummm Officer Sowers was uhh had an observation post set up in the area.  Any uhh he was the observing of some narcotics transactions.  Umm he did observe a narcotics transaction with Stanton and another unidentified male. Umm so he gave the lookout for that, for the buyer and the buyer was never caught , gave the lookout for Stanton and we could get on the  scene to make sure that we could get a positive i.d.

HE: So what role were you in?

BB: I was the jump out.

HE: You aid in the arresting.

BB: Right.

HE: Ok.

BB: So we jump out and we get Stanton and we make sure there's a positive ID and then Harry gives me a uhhh direction a to location where I get a stash, a square flower box with some mulch and uhhh when we get that then he is arrested.

HE: Ok so, you are saying that someone from the observation post, this is Officer Sowers.

BB: Correct

HE: Once he see the transaction, he gives a look out for both the buyer and who he believes the seller is?

BB: Yes, whatever he said [inaudible]

HE: Ok.  Now once you get information, you are looking for who?

BB: I don't remember who, the buyer was, never caught

11

HE: Ok

BB: I went to the seller.

HE: You went to the seller.  And how did you know to go to Mr. Stanton?

BB:  By comparing-- by the lookout.

HE: And do you know what this consisted of?

BB: (pause) Black male, with black raincoat, umm black hat and glasses.  But once we [inaudible] then we go to the area… [inaudible]  see if we can see him and then positively identify him while we have him.  So that.. [inaudible]

HE: So it was a physical description.  You said…

BB: Well it isn't physical, I mean right now its clothing.

HE: So that…ok

BB:  But then when we have him and he can see us, then we tell these guys that's him, that's called a positive ID.

HE: And the person that was seen is the one Sowers observing.

BB: huh?

HE: The person who you said that would see him, once you secure him, is the person observing.

BB: Sowers, yeah the observation post.

HE: And he would inform you by radio as to whether or not you have the right person.

BB: Yeah, on a special channel.

HE: And you said that you admitted to his stash.

BB: Exactly.

HE: And this is based on what Sowers saw?

BB: Yeah.  I, I…

HE: Ok.  Now this stash that was located, was Mr. Stanton near it?

BB: Umm, somewhat.  Umm I can't really say how far away. But I mean… the car, sidewalk.. I mean.  I can't really say wasn't like right, right next to his foot, but that it was probably a few feet.

HE: Mhmm

BB: Maybe more.

HE: Was Stanton on foot or in a vehicle?

BB: When we got him he was on foot.  When I stopped him.  I don't know if he was ever inside of a vehicle, but he was on foot when got him.  Sitting on a wall behind a vehicle.

HE: Is that where you stopped him?

BB: Umm.  My eyes there  the security officer named Crutchbrown, walked out through there and my other [inaudible]…

HE: You saying someone out there sprayed pepper spray?

BB: One security officer had used pepper spray a little while ago, they had an incident.  And it see don't take much… and he walks down and back here, right.  And I still… there ain't going to be nothing bad.  My eyes are starting to get itch little bit.

HE: Alright.

BB: Ummm.uuuuhhhh

HE: You said he was on foot.  Yeah, trying to find out where, where did you locate him?

BB: Umm. Somewhere in the area right there, in the Temple Court area.  There's like a flower box there, its like a little sidewalk.

HE: Ok.

BB: as far as the car goes, they walked to the rear of a Honda Accord and sat down on the wall area. Ok. So I remember where the car was and where I remember where got the stash. And he was right there in the vicinity of the car with the stash. [inaudible]

HE: Was this car connected to him in any way?

BB: Umm no.

HE: Alright, so once you locate the stash, what do you find?

BB: Umm a green uhh zip containing 14 smaller zips of crack cocaine.

HE: Was this substance tested?

BB: Yeah, positive.

HE: Did uhh, Mr. Stanton say anything about the drugs that you found?

BB: Not that I can remember.

HE: And at what point was he placed under arrest?

BB: Ummm. He was identified then, probably once I found that stash.

HE: At the…

BB: That's probably, yeah, I can't remember.

HE: Was he told why he was then arrested?

BB: Ummm, I don't remember, I'm not sure, who tells him, sometimes we don't, sometimes they know when you ask them. I told… I don't really remember.

HE: DO you remember other people being in that same area?

BB: Yeah, officers. What officers? Or other …?

HE: Other, just, people in the area?

14

BB: Yeah, there was, yeah.  I don't know how many or what color clothes they had on or nothing like that.

HE: Anyway, that this man was mixed up with somebody else wearing the same thing?

BB:  Not as far as we're concerned.  Harry identified him, so…  I don't know how you can mix up when an Officer saying it's him.  The only thing I can go by, you know what I'm saying?

HE: Yeah, you are telling me what the observation officer…

BB:  You are asking if the guy got mixed up somebody else?

HE:  Right… based on appearance

BB: Not, not according to the, not according to the observation post officer.  That's why [inaudible].  He asked about certain things.

HE:  And you're, you're whole reaction to everything is based on what the observation officer said.

BB: Exactly and he's not here.

HE: Ok.  Were you required to appear in court on this date?

BB: I don't remember.  I was not the one who papered it.

SB: It was no papered.

BB: I don't do the papering.

HE: So you didn't have to go to court?

BB: No, [inaudible]

SB: It was no papered, so nobody had to go to court.

HE: I am aware of that.  I just want to know what he…

BB: I don't know, I don't do the papering.

HE: Ok.

15

BB: Umm. It says I may have…[inaudible]  We all take turns in taking cases in court, so I don't know.

HE: I want you to answer questions of counsel.
SB: Before I ask any questions, we need to request that Officer Sowers testify.

HE: I'm sorry?

BB: [inaudible]

SB: I'm renewing my request for that Officer Sowers to testify in person.  Umm.  Lets see.  Uhh.  Officer Bartholomew, you did not witness the alleged drug transaction here.

BB: Correct.

SB: And, you were without officers Salimone, you were with another officer when Mr. Stanton was arrested.

BB: Yeah a couple of police.

SB: Ok. You were not the primary officer responsible for the arrest.

BB: You've got to ask that in a better way.

SB:  Umm ok, so you, according to the PD-163 all you did was pick up the drugs,is that correct?

BB: Yes.

SB: and you never saw Mr. Stanton in possession of the drugs.

BB: Exactly

SB: And you didn't see him drop the drugs.

BB: Exactly

SB: and you didn't conduct a search of him.  You didn't search his person when you arrested him.

BB: Umm I can't remember.  But bet he was searched like anyone [inaudible]

SB: Did you, did you fill out. Sorry.

BB: [inaudible]put handcuffs on him

SB: Did you fill out the PD-163 or was it…

BB: Umm I doubt it.  Its typed so we all have different, different people type them up.  It's because the arresting officer [inaudible]

SB: Its signed by…

BB: The back of it, Harry Sowers did, the observation post officer.

SB: Ok

BB: That's whoever does the back should sign the bottom. The front, anyone can do.

SB: Ok.  And on the front, here in box number 32, it says that the suspect had a tattoo under his eye, a tear drop. Mr. Stanton does not have a tattoo under his eye.  Is it possible that the person filling out the PD-163 or is it possible that Officer Sowers had included that detail in his lookout?

BB: Possibly

SB: Could Officer Sowers have given a lookout for somebody with a tattoo under his eye?

BB: I don't…

SB: You don't remember?

BB: I can say anything that Officer Sowers had seen him do.

SB: Is there any other reason…

BB: I don't know, somebody must have made a mistake on there.  I don't know where that came from.

SB: Ok. Umm.  Ok. Thank you.

17

BB: Anybody could have mistaken that as a tear drop or something. Obviously there is something there, but I mean...

SB: Umm...Did you stop Mr. Stanton before you arrested him? Did you stop him once and come back later and arrest him?

BB: I don't know.

SB: Would you be able to remember what happened in this case if you hadn't reviewed the paperwork?

BB: You always review the paperwork even when you are going to trial.

SB: Thank you.

BB: But I remember clearly. Yes. I mean not every little single thing. But most of it.

DR: But you are really picking on the [inaudible]

BB: Just ask questions, and Ill answer them. I remember the lookout for the car. Who was behind the grey Honda vehicle. Umm. That we stopped him. Umm. I remember going over to the tree box after we called and identified, where he was apparently making the transaction from. And where the streetlight, and picking up the green packets that had crack in it.

SB: Ok now, the lookout was given for a black male, black raincoat, black hat and glasses. Lookout didn't say how tall the suspect was?

BB: No.

SB: Didn't say how much he weighted?

BB: Not at all.

SB: And didn't say whether or not he had facial hair?

BB: No

SB: And didn't give any other identifying information?

BB: No. But it was possible to ID him

18

SB: Right.  But the lookout was pretty general.

BB: Yeah

SB: Ok.  Alright

BB:  Usual though

SB: Well if he's wearing the same type of pants..

BB: I think we stopped the right guy, we usually stop the right guy the best we can based on their clothing then to make it secure we get a positive ID.

SB:  Well, yeah, let me just clarify though that you didn't actually see Mr. Stanton in possession of any drugs.

BB: No

SB: And you didn't actually see him drop the drugs.

BB: No

SB: Ok. Thank you.

DR: Officer Bartholomew, if you are so sure that you stopped the right guy, why is the case no papered immediately?

BB: a lot of reasons are no papered.

HE: That rests with the US Attorneys Office doesn't it?

BB: Huh?

HE: Does that rest with the US Attorneys Office to no paper a case?

BB: Right, I mean you all can get into this… [inaudible]

HE: But is that true?  You make the arrests and the information goes to the US Attorneys Office and then they just see.

BB: Let me explain something down here.  They are going to give me a look out.  We are going to stop the person that we think best fits the look out.  We are gonna stop them

and that's going to be it.  And then we are going to get a positive ID and that's it.  We'll go by that.

DR: So you went by the ID.

BB: Yeah. And whatever first [inaudible] You know what I'm sayin?

DR: But sometimes it happens with the wrong person is locked up… sometimes.

BB: Umm no. I mean according to us we going to go by, you know, .. knowing a lot of people play a role.

DR: But its possible that some people you arrest are not guilty, right?

BB: Umm  yeah because you cant, I can only go by the things that I do.  You can't go by, you, we don't know, you know the, in reality what the other officer sees or what goes on.  I mean there a lot to it.  Right, we all know that right?

Many people: Yeah

SB: And it is possible that based on such a general look out you could have stopped a person who is the wrong person.

BB: We stopped the person that the other officer gave lookout for.  Anything else other than that, I can't answer for.

SB:  Ok, ok.  Thank you.

BB:  I do my part.  I do my part, which I can do.

HE: And you have no doubts that the identification was positive for Mr. Stanton.

BB: Yeah, no doubt.  Cuz I mean we have a secure channel, right.  So…  We stopped on the scene, positively identified, while the operation goes on from that point, that's all I need.  [inaudible]

HE: Council, anything further?

SB:  Uhh, no ma'am.

HE: Officer Bartholomew, is there anything that you haven't had an opportunity to say that needs to be considered today?

BB: No. not off the top of my head.

HE: Ms. Ritter, anything further?

DR: No

HE: Ok.  Do you have paperwork with you for me to sign?

BB:  Yeah, if you could sign that

--- break in tape---

HE: The Officer Bartholomew knows why Officer Sowers is not here today and I have asked him to communicate with the office to let them know why he is not here today.  Cuz I have not heard the record from the office.  Processes, it will contact the officer as to why they are no-show. Alright?  Mr. Stanton what would you like to say about this arrest.

CS: Umm when they came, they stopped me first and then let me go.  They was on the radio saying "not him".  They didn't know for sure, so then they came back and arrested me.  And they didn't even tell me what they were locking me up for.  I asked them over and over.

HE: And how long was it between you being stopped and them coming back?

CS:  It was a few minutes.  He went to walk off.  I don't know where they went.  They walked off in the parking lot and then came back and arrested me.  Didn't even tell me why he was arresting me.

HE: Had you changed you location between these arrests?

CS:  Naw.  I still stood right there, even when he first stopped me.  I stood right there, they walked off, and came right back and arrested me.

21

HE: So, you're saying there was more than one officer and they all walked off and came back?

CS: There was two of them.  There was him and another one.

HE: Ok.  Did you see them when they walked off?

CS: Naw, I didn't pay no attention, they walked off.  I stood right there and they came back.  They said, "put your hands behind your back."  I said "What you locking me up for?"  They said "We will tell you when we get down to the police station."

HE: In that time frame between stopping you and returning was how long?

CS: It wasn't that long.  Probably like 5 minutes.

HE: But you didn't see where they had gone.

CS: No.

HE: Counsel did you want to ask any questions?

SB: I wanted to just submit a statement of a witness who was with Mr. Stanton in between the time of the police stopped him the first time and when they came back and arrested him.  That essentially confirming everything that Mr. Stanton has just told you.  I also wanted to, uhhh, let you know that I spoke with Mr. Stanton's mother, who lives, she was unable to be here today because had to work.  And she indicated that after he was arrested, she called the police station to find out what was happening and the officer she spoke with, whose name she did not get, told her that he would be released because it was a case of mistaken identity.  And according to…

HE: This is what the mother was told?

SB: Yes, her name was Michelle Dixon.  And she said that they used the phrase mistaken identity when she called. And the officer that she spoke with said that he would be released.  She was concerned because he wasn't released right away.  I guess the police officer didn't tell her that it takes until the next day for him to get released, but she was told that he was not the man they were looking for.

HE: And you said she couldn't come in today for what reason?

SB: She had to work.  She works at the Pentagon and she wasn't able to get time off from work.  Mr. Stanton lives with her and she's, she has a number of health problems that he helps her with, so he is a, uhh, very responsible community member.  He takes care of his mother, does the grocery shopping, takes her to and from her medical appointments.  She depends on him for a lot.

HE: Ms. Williams did you discuss this arrest with Mr. Stanton?

CSO:  Yes.

HE: And what did he tell you?

CSO: Verbatim what he just stated.

HE: Repeat it to me.

CSO: He came in and said that he was standing by, minding his own business talking to someone, friends or associates. He said they ran up on him.  I'm quoting his words "grabbed him, let him go."  He was, you know, questioning back "Why are you arresting me?" They let him go.  He said they returned right after they let him go.  And arrested him and took him downtown.  Exactly what he said.  And I asked him the question "Was there anyone out there?" I'm sure he wouldn't have told me, but that he knew maybe were trying to sell drugs, or wreaking havoc and he said no.  He was just standing there.

HE: Actually, he questioned the officers as to why they stopped him?

CSO: Yes.

HE: And they responded?

CS:  They told me they would tell me when I get down to the station.

CSO: Initially, you said…

23

CS: Initially, the first time they just grabbed me.  And they was on their radios talking and then they let me go.

HE: Ok.  Stopped him, tell you once you get down to the station, and what happened after that?

CSO: He went down to the station.

CS: I went down to the station and that's when they told me that I was arrested for drugs.

HE: So they came back?

CS: Why he was saying they stopped me.  I asked them.  They didn't tell me right there.

HE: Uh huh

CS: They walked off and then they came back.  Arrested me, I asked them what they locked me up for.  That was the second time.  They said we tell you when we get down to the station.  They took…

HE: SO the first time they didn't say that.

CS: No. The first time they just grabbed me and they was on the radio.  And they pat me and walked off from me.

DR: No officer stood with you while you were…

CS: No, no officer stood with me.

SB: And the first time they stopped you they didn't take anything from you, did they?

CS: Nuh-uh.

HE: Did they ever tell you about the stash that they found?

CS: When I got down to the police station, they aint said there was a stash, they said "We seen, we found some drugs. I aint telling you where we found them at."

HE: Anything else?

SB: Umm, I just wanted to reiterate that umm we would renew our request for Officer Sowers, he is, Mr. Stanton has the

right to confront any witnesses who actually saw him
engaged him in an alleged crime. And he, umm, and, and.
I'm sorry got distracted for a second there. Ummm.
Because Officer Bartholomew's testimony is just not
reliable. He didn't remember anything without looking at
the PD-163 and it's clear from the PD-163 that his role in
the arrest was really minimal. And all he did was go and
pick up drugs off of the ground. And he had no idea
whether those drugs had any, had any connection to anyone
that he was stopping, except for Officer Sowers observation
post. And he said that, Officer Bartholomew said several
times that he could not speak for Officer Sowers, and he
couldn't tell us what Officer Sowers knew or saw or thought
or said. And umm without Officer Sowers' testimony
there's, it's, there's just no evidence against Mr.
Stanton.

HE: Ok. In this, uhhh, statement you forgot to me, that
some reference made to a tape. What do you know about
that?

SB: According to the witness, the police were just ummm
saying to Mr. Stanton that he would be able to see the
evidence they had when he got down to the station. And
that was just when he asked them what he had been arrested
for they said "we've got you and we'll show you down at the
station."

CS: They said observation, they said they had me on camera.
They never showed it to me.

SB: In addition, I would submit that if they did have a
tape, then there is no reason why the case would have been
no papered, because they would have had clear, documented
evidence of the crime. So I, I, that seems like its just
puffing.

HE: And they told you about filming it, as well.

CS: Yeah.

HE: Had I not excused the officer, I would have called him
back in and questioned. If that was part of the routine
that day. Which could have made a difference.

SB: Although I think if we ummm, that's only something that
can be confirmed by Officer Sowers because the tapes…

HE: Ehhh, I don't think being part of a team that people on the arrest team would know also if it's being taped.

SB:  Yeah, he…

HE:  That's something that all of them should know.  If he comes in here and say, we didn't tape it, we don't normally do it, that didn't happen.  It's a matter of answering the question.  I'll look back out there and see if he's still here.  If he is, Ill bring him in here.

DR:  He was busy out front.  So he's gone.

HE: Oh, you already seen him?

DR: Oh yeah, he was horsing around with a guard out front.

HE: Ok. Understand that could have put [inaudible] on closure, as opposed to a continuance which is where this is leading.  Just, for information.  Sometimes its good to know some things in advance of the testimony, or at least I could have said hold him here, but I didn't anticipate this statement or anything in reference to a tape that you were told that your mother, right, mother was told that…

CS: No.

SB: No his mother…

HE: Who did this? [referring to the statement]

SB: The witness to the arrest.

HE: The mother was told mistaken identity.  This is the person standing next to him that day.  Is that right?

CS: Yeah

HE: Make sure I have a distinction on that.  Make sure I put that in my summary again, the next examiner can inquire about it.  Anything further?

SB: I just wanted to ask Ms. Williams if the uhhh arrest charge went there, would she, would you have issued a warrant based on the uhhh positive urines?

CSO: No, I mean, I don't want to say that I don't condone drugs use. And we were adhering to it. You know, sanctions. However, besides the drug use, he was doing things correctly. He was diligently looking for a job, had just been released from a job, ummm each time unannounced or announced, always at the residence. I've spoken with his mother on several occasions. The same thing their attorney is stating, is exactly what she states. Umm and I wouldn't, no I wouldn't have. The only reason why uhhh the AVR was submitted was based on the re-arrest.

HE: Mr. Stanton where do you plan to reside upon your release?

CS: My mother.

HE: Give me her name.

CS: Michelle Dixson.

HE: D-I-C-K…

CS: D-I-X-O-N

HE: D-I-X-O-N. And her residence?

CS: 1907 Gold Road. 1907 Gold Road. Southeast. Apartment 2. 20020.

HE: Phone number there?

CS: 889-1591.

HE: 889-1591? Does that coincide with the information?

CSO: 1591, Yes ma'am.

HE: Ok. Mr. Stanton, before I uhhh brief this, consider my final as a recommendation. I will review with you the salient factor score they give you to read the guideline range. We have a salient factor score of 4. Based on 4 prior convictions, 2 commitments. Do you want me to review those convictions with you?

DR: No. We agree.

HE: I noticed that in the presentence report there were some other things that popped up but they were not scored and ummm I don't see a reason to include them. Ok? DO you understand the salient f actor score and how we come up with that number?

CS: Yeah.

HE: Alright. You can look on the other side, there, the 4 puts you in a fair category. Looking at the highest of areas, that would be the distribution of the drugs we are looking at a category 3. Cuz we don't know a quantity. Ok? That's 18-24 months in the parole guideline range. You are supposed to be on supervised release maximum is 36 months. In the event that that case is a no finding made, for this hearing, or a subsequent hearing the administrative charge alone is a category one. Puts you in the re-parole guideline range from nine to 12 months. See that? Under a category 1? Alright? Any questions about that of what you are facing?

CS: No

HE: Ok. Council, anything else before I recess?

SB: I would just like to point out that he shouldn't be revoked for a behavior that could be sanctioned on the street. And it's clear that the sanctions for the use have been successful on the street. And there's simply no evidence that he even possessed drugs, let alone possessed them with the intention to distribute them.

HE: Ok.

---- Break in tape----

HE: On the record, for my final is a recommendation. In charge number 1, the use of drugs, I do find violation in that charge. I do agree with council that it at this time is not sufficient for revocation and that is based on the fact that the intervening sanction imposed by CSO Williams appear to have been effective. In charge number 2, you have not waived your to cross examine, Officer Sowers, so I will defer a finding in that charge and continue for a subsequent hearing to re-subpoena Officer Harry Sowers. That's it. You of course will remain in custody until the

next hearing.  I'm going to have you taken into custody now.

CS: Two months.

HE: Two months.  You know the bottom of your range is 8 on a category one, 18 on a category 3.  Just keep that in mind, you get credit for all of that time.  Now if there is no violation and you are released that's time that only in a subsequent hearing will be credited towards you. Alright?

CS: Alright.

HE: Thank you.



HE: You have the right to cross examine